## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

**REVEREND DWIGHT COKELY**
904 Jackson Valley Court,
Bowie, MD 20721
Prince George's County,

**MICHAEL ANDREW CARLISLE**
166 Westway
Greenbelt, MD 20770
Prince George's County,

**ERICA MCKINNEY**
4306 Reverend Eversfield Ct
Upper Marlboro MD 20772
Prince George's County,

**IAN ROWE**
4806 Erskine Rd,
College Park, MD 20740
Prince George's County,

**MARK SHRODER**
4909 Muskogee St,
College Park, MD 20740
Prince George's County, and

**LEONARD GORE, JR.**
3705 Deming Dr.,
Suitland, MD 20746
Prince George's County

        *Plaintiffs,*
v.

CIVIL ACTION NO.

_____

**WENDY HONESTY-BEY,** in her official capacity as Administrator of the Prince George's County Board of Elections, 1100 Mercantile Lane Suite 115A Largo, MD 20774 Prince George's County, and

**PRINCE GEORGE'S COUNTY, MARYLAND**
Serve on:
Anthony Jones, Esq.
County Attorney
1301 McCormick Drive Suite 4100
Largo, MD 20774
Prince George's County,

     *Defendants*.

## **COMPLAINT**

Plaintiffs bring this action to secure compliance with the "one person, one vote" requirements of the Equal Protection Clause of the U.S. Constitution, *see* U.S. CONST. AMEND. XIV, in connection with the 2021 legislative redistricting plan for the Prince George's County Council. As adopted, the plan does not reflect an "honest and good faith effort to construct districts…***as nearly of equal population as is practicable***," as required by the Equal Protection Clause. *See Reynolds v. Sims*, 377 U.S. 533, 577 (1964) (emphasis added); *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elec.*, 827 F.3d 333, 340-41 (4th Cir. 2016) [hereinafter, *"RWCA"*]. Additionally, the plan does not comport with the

population equality and compactness requirements of the Charter of Prince

George's County, Maryland, *see* P.G. CO. CHARTER § 305.

Plaintiffs seek declaratory, injunctive, and other appropriate relief to secure

Defendants' compliance with the Equal Protection Clause and the Prince George's

County Charter. Such relief includes but is not limited to the invalidation of the

challenged plans and the approval of remedial redistricting plans that comport with

the Equal Protection Clause and the County Charter.

## JURISDICTION AND VENUE

1.      Jurisdiction is vested in this Court pursuant to 28 U.S.C. §§ 1331,

1343, 1367, and 2201.

2.      Venue appropriately lies in this District and Division pursuant to 28

U.S.C. §§ 100 and 1391(b).

## PARTIES

3.      Plaintiff Reverend DWIGHT COKELY is a resident and registered

voter of Prince George's County, Maryland. Under the current County Council

redistricting plan, he resides in District 4. District 4 is not compact and is

unjustifiably overpopulated. Reverend Cokely's vote will carry less weight in

elections for the Prince George's County Council than voters who live in

underpopulated districts.

4.     Plaintiff MICHAEL ANDREW ("DREW") CARLISLE is a resident and registered voter of Prince George's County, Maryland. Under the current County Council redistricting plan, he resides in District 4. District 4 is not compact and is unjustifiably overpopulated. Mr. Carlisle's vote will carry less weight in elections for the Prince George's County Council than voters who live in underpopulated districts.

5.     Plaintiff ERICA MCKINNEY is a resident and registered voter of Prince George's County, Maryland. Under the current County Council redistricting plan, she resides in District 6. District 6 is unjustifiably overpopulated, so Ms. McKinney's vote will carry less weight in elections for the Prince George's County Council than voters who live in underpopulated districts.

6.     Plaintiff IAN ROWE is a resident and registered voter of Prince George's County, Maryland. Under the current County Council redistricting plan, he resides in District 3. District 3 is not compact and is unjustifiably overpopulated. Mr. Rowe's vote will carry less weight in elections for the Prince George's County Council than voters who live in underpopulated districts.

7.     Plaintiff MARK SHRODER is a resident and registered voter of Prince George's County, Maryland. Under the current County Council redistricting plan, he resides in District 1. District 1 is unjustifiably overpopulated, so Mr.

Shroder's vote will carry less weight in elections for the Prince George's County Council than voters who live in underpopulated districts.

8.    Plaintiff LEONARD GORE, JR. is a resident and registered voter of Prince George's County, Maryland. Under the current County Council redistricting plan, he resides in District 7. District 7 is not compact and is part of a redistricting plan that is not compact.

9.    Defendant WENDY HONESTY-BEY is sued in her official capacity as the appointed Administrator of the Prince George's County Board of Elections ("County BOE"). The County BOE is an agency of the State of Maryland and is responsible, *inter alia*, for conducting all elections in Prince George's County, other than municipal elections, in an open, convenient, and impartial manner, subject to the supervision and direction of the State Board of Elections; establishing and altering the boundaries and number of precincts within the county; establishing polling places and assigning voters for each precinct; and administering voter registration in the county. As Administrator of the County BOE, Defendant Honesty-Bey is the chief local election official responsible for employing and supervising all staff and operations of the County BOE.

10.    Defendant PRINCE GEORGE'S COUNTY, MARYLAND ("County") is a political subdivision of the State of Maryland and is subject to the

requirements of the United States and Maryland constitutions, federal and state law, and the Prince George's County Charter.

## **FACTUAL ALLEGATIONS**

11.    On or about January 28, 2021, pursuant to the provisions of Section 305 of the Prince George's County Charter, the County Council of Prince George's County appointed a three-member Redistricting Commission and charged it with the responsibility of preparing a decennial redistricting plan for the County Council by September 1, 2021. The Council specified that, as required by the Charter, the plan must provide for council districts that are "compact, contiguous, and equal in population."

12.    The Redistricting Commission adopted the plan on August 30, 2021, and transmitted it to the County Council on September 1, 2021. The plan took effect by operation of law on November 30, 2021. *See Prince George's County v. Thurston*, 477 Md. 629 (2022).

13.    The county's population had increased by approximately 12% between 2010 and 2020, from 863,420 to 968,772; however, the dispersion of that growth across the county was uneven:

**Population Growth Across 2011 Council Districts**

| 2011 District | 2020 Adj Pop | 2010 Tot Pop | Numeric Growth 2010-2020 | Percentage Growth 2010-2020 |
|---|---|---|---|---|
| 1 | 114,537 | 98,324 | 16,213 | 16.49% |
| 2 | 102,112 | 92,078 | 10,034 | 10.90% |
| 3 | 112,674 | 99,070 | 13,604 | 13.73% |

| 2011 District | 2020 Adj Pop | 2010 Tot Pop | Numeric Growth 2010-2020 | Percentage Growth 2010-2020 |
|---|---|---|---|---|
| 4 | 107,494 | 98,775 | 8,719 | 8.83% |
| 5 | 107,371 | 94,376 | 12,995 | 13.77% |
| 6 | 115,900 | 96,970 | 18,930 | 19.52% |
| 7 | 97,701 | 95,219 | 2,482 | 2.61% |
| 8 | 103,087 | 93,819 | 9,268 | 9.88% |
| 9 | 107,896 | 94,789 | 13,107 | 13.83% |
| **Total** | **968,772** | **863,420** | **105,352** | **12.20%** |

**Note**: "Adj Pop" refers to the adjusted P.L. 94-171 population figures required by Maryland law to count state or federal prisoners as residents of their last known address before incarceration. "Tot Pop" refers to the unadjusted P.L.94-171 population data from 2010.

14.    The Prince George's County Redistricting Commission retained Dr. Nathanial Persily, a Stanford University Law School professor and political scientist, as a consultant to assist it with preparing maps. Dr. Persily was also the Commission's retained consultant during the 2011 redistricting cycle.

15.    Under the 14th Amendment to the U.S. Constitution, the Redistricting Commission was obligated to make an "honest and good faith effort to construct districts…as nearly of equal population as is practicable," *Reynolds*, 377 U.S. at 577 (1964) (emphasis added); *see also RWCA*, 827 F.3d at 340-41.

16.    The Supreme Court has recognized that "[w]here the maximum population deviation between the largest and smallest district is less than 10%, a state or local legislative map *presumptively* complies with the one-person, one-vote rule." *Evenwel*, 578 U.S. at 60 (emphasis added). However, there is no "safe harbor" threshold of validity below 10%. *Larios*, 300 F. Supp. 2d at 1340–41. Where illegitimate, arbitrary, or discriminatory factors predominate over legitimate

redistricting considerations and result in greater than necessary population deviations, a plan does not comply with "one person, one vote." *Harris*, 578 U.S. at 258–59; *RWCA*, 827 F.3d at 341–42; *Wright*, 787 F.3d at 264.

17.     Dr. Persily advised the Commission that since this was not a congressional redistricting plan, individual districts could "generally deviate from perfect population…by about five percent" in either direction, which could potentially result in a maximum population deviation of up to 10%.

18.     From the outset, the Commission determined that its primary goal would be to arrive at a "least change plan," *i.e.*, "one that moves the fewest number of people as necessary to ensure compliance with one person, one vote," which they interpreted as allowing anything that resulted in a maximum population deviation of less than 10%, or a maximum individual district deviation of ±5%.

19.     Because it was dealing with population estimates at that time it met (due to Covid-related delays in receiving official census data), the Commission determined that it should keep maximum individual district deviations in its plan to ±4.5%, to allow for any discrepancies between the estimates and the eventual adjusted P.L. 94–171 data that would be released by the Census Bureau and the Maryland Department of Planning.

20.     In addition to (1) "least change plan" and (2) maximum individual district deviation of ±4.5%, the Commission adopted three other redistricting

principles: (3) avoiding splits of precincts; (4) keeping districts contiguous; and (5) considering physical assets or infrastructure that connect districts, such as Metro stations, colleges and universities, schools, community centers, churches, economic development areas, and major employment sites. The Commission members discussed and unanimously agreed upon these five redistricting criteria at the Commission's May 3, 2021, meeting.

21. The Commission did not identify or adopt compactness as a redistricting criterion that it would consider, even though the County Charter specifically required that council districts be compact. Indeed, the word "compact" only appears once in the Commission's report to the Council on the adopted plan, and then only in the context of discussing the first *Gingles* precondition used to evaluate claims under Section 2 of the Voting Rights Act.

22. At the Commission's June 21, 2021, meeting, Dr. Persily discussed the pros and cons of a least change plan approach. He reiterated that the goal of the least change approach is "to keep districts as stable as possible and do what is minimally necessary to comply with applicable law," and that the advantage of that approach, in his estimation, is that it "is least disruptive to the incumbents, voters, and the electoral system as a whole." Yet, Dr. Persily cautioned, "the benefits of a least change plan are only as great as the desirability of the existing plan.  If an

existing plan is seen as defective or undesirable for some reason, then the least change plan replicates those undesirable features."

23.    One undesirable feature of the County Council's adopted 2011 redistricting plan is that it was itself malapportioned based on the 2010 population data, with a maximum population deviation of 6,992 people or 7.29% of the ideal district population of 95,936:

**Deviation of 2011 Council Districts From
2010 Ideal District Population**

| 2011 District | 2010 Tot Pop | Numeric Deviation from 2010 Ideal | Percentage Deviation from 2010 Ideal |
|---|---|---|---|
| 1 | 98,324 | 2,388 | 2.49% |
| 2 | 92,078 | -3,858 | -4.02% |
| 3 | 99,070 | 3,134 | 3.27% |
| 4 | 98,775 | 2,839 | 2.96% |
| 5 | 94,376 | -1,560 | -1.63% |
| 6 | 96,970 | 1,034 | 1.08% |
| 7 | 95,219 | -717 | -0.75% |
| 8 | 93,819 | -2,117 | -2.21% |
| 9 | 94,789 | -1,147 | -1.20% |
| Total Pop | 863,420 | | |
| Ideal District Pop | 95,936 | | |

The highlighted rows reflect the highest and lowest district deviations, from which the maximum population deviation figure is calculated.

24.    Another undesirable feature of the 2011 redistricting plan was that it was not particularly compact, even when considering a mix of legitimate factors that could contribute to noncompactness, including the paramount requirement for population equality, the concentration or dispersion of people, geographic features

of the County, and other factors that might be conducive to constituent-

representative communication, such as convenience of access and communication:

**2011 County Council Districts**



25.     A third undesirable feature of the 2011 plan was that it unnecessarily

"cracked" the inner-Beltway urbanized areas of the county that share a variety of

common interests and characteristics, as compared to the more suburban and rural

areas outside of the Beltway, including: increased transit dependency and

proximity; increased population and housing density; lower home values; less

access to quality retail and grocery stores; greater needs for infrastructure

investments to improve walkability; and unmet needs for quality mixed-use urban

transit-oriented development, including modern multifamily housing units.

26.    Indeed, Plaintiff McKinney, who lives in Upper Marlboro in District 6, lives in a car-dependent area and commutes about an hour to work by car, while Plaintiffs Shroder and Carlisle are more concerned with public transit and access to bike trails and infrastructure options that are not dependent on cars.

27.    Although the population of the inner-Beltway could fit into approximately four compact districts, it was dispersed among eight of the nine council districts.

28.    At the June 20, 2021, meeting, Dr. Persily presented two "least change" examples where he applied maximum district deviation standards of $\leq 2\%$ and $\leq 1\%$. These proposals demonstrated that it was possible, even under a least change approach, to achieve maximum district deviations of $\pm 1\%$ (and maximum population deviations of less than 2%), by moving approximately six precincts and impacting fewer than 20,000 people, or less than 2.3% of the county's population. Dr. Persily concluded that these "rather insignificant changes" could result in "large payoffs from the standpoint of population equality."

29.    In addition to Dr. Persily's scenarios, there were many other ways to achieve maximum district deviations of $\pm 1\%$—even under a least change model— that would not have required excessive splitting of municipal boundaries or moving significant numbers of people.

30.     Ultimately, after the mid-August 2021 Census Bureau release of the unadjusted P.L. 94-171 data from the 2020 census, the Redistricting Commission adopted a "least change" redistricting plan for the County Council in line with its previously stated ±4.5% district deviation target. The plan moved five precincts and 12,320 people, and resulted in a maximum population deviation, based on the adjusted 2020 P.L. 94-171 data, of 7,379 people or 6.86% of the ideal district population of 107,641:

**2021 Council Districts**

**Deviation of 2021 Council Districts From
2020 Ideal District Population**

| 2021 District | 2020 Adj Pop | Numeric Deviation from 2020 Ideal | Percentage Deviation from 2020 Ideal |
|---|---|---|---|
| 1 | 110,458 | 2,817 | 2.62% |
| 2 | 106,191 | -1,450 | -1.35% |
| 3 | 110,466 | 2,825 | 2.62% |
| 4 | 109,702 | 2,061 | 1.91% |
| 5 | 107,371 | -270 | -0.25% |
| 6 | 109,841 | 2,200 | 2.04% |
| 7 | 103,760 | -3,881 | -3.61% |
| 8 | 103,087 | -4,554 | -4.23% |
| 9 | 107,896 | 255 | 0.24% |
| **Total Pop** | **968,772** | | |
| **Ideal District Pop** | **107,641** | | |

The highlighted rows reflect the highest and lowest district deviations,
from which the maximum population deviation figure is calculated.

31.    It was not necessary for the Commission to adopt a plan with a
maximum population deviation of 6.86% to achieve geographic compactness.
Indeed, the Commission had received community-drawn maps that were more
compact and achieved greater population equality.

32.    It was not necessary for the Commission to adopt a plan with a
maximum population deviation of 6.86% to maintain the integrity of political
subdivisions. Indeed, the Commission had received community-drawn maps that
maintained such integrity to a greater extent than the Commission's plan, while
achieving greater population equality and greater compactness. Additionally, the

Commission did not include giving due regard to municipal boundaries among its adopted redistricting criteria.

33.    It was not necessary for the Commission to adopt a plan with a maximum population deviation of 6.86% to preserve the cores of the previously existing districts, in line with a "least change" philosophy. Indeed, the Commission's own consultant, Dr. Persily, exhibited an example of a least change plan with a maximum population deviation under 2% in July 2021.

34.    It was not necessary for the Commission to adopt a plan with a maximum population deviation of 6.86% to minimize precinct splits. Indeed, precinct boundaries are routinely adjusted by the County BOE each redistricting cycle, after necessary population adjustments have been made to comply with constitutional and charter requirements.

35.    It was not necessary for the Commission to adopt a plan with a maximum population deviation of 6.86% to preserve physical assets or infrastructure that connect districts, such as Metro stations, colleges and universities, schools, community centers, churches, economic development areas, and major employment sites. Indeed, the Commission had received community-drawn maps that minimized splits of WMATA Metrorail line segments and Metrorail station half-mile walksheds within the county; maintained the integrity of higher educational institutions like the University of Maryland at College Park,

Bowie State University, and Prince George's Community College; and maintained the integrity of major employment sites such as Goddard Space Flight Center, the Beltsville Agricultural Research facility, and Joint Base Andrews, all while achieving greater population equality and greater compactness.

36.    Additionally, like the 2011 plan, the Commission's 2021 plan arbitrarily and unnecessarily "cracked" inner-Beltway urban communities countywide.

## COUNT I:
## DENIAL OF EQUAL PROTECTION UNDER THE FOURTEENTH AMENDMENT (ONE PERSON, ONE VOTE) (42 U.S.C. § 1983)

37.    Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

38.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, in pertinent part, that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

39.    Inherent within the guarantees of the Equal Protection Clause is the principle of "one person, one vote," which requires that states and their political subdivisions design their legislative districts based on population and that they make an "honest and good faith effort to construct districts…*as nearly of equal population as is practicable.*" *Reynolds*, 377 U.S. at 577 (emphasis added); *RWCA*, 827 F.3d at 340–41.

40.     As detailed in the preceding paragraphs, the Prince George's County Redistricting Commission did not make an honest and good faith effort to achieve population equality across the nine County Council districts. The Commission set a specific numeric target that allowed for population deviations of up to ±4.5% in each district and rejected alternative plans produced by its retained consultant, Dr. Persily, and by the public, that achieved greater population equality and greater compactness.

41.     The Commission's reliance on a specific ±4.5% district deviation target as a "safe harbor," along with other arbitrary, illegitimate, or discriminatory factors, predominated over commonly recognized legitimate redistricting considerations, including the specific criteria that the Commission had adopted for itself.

42.     The Commission's plan unjustifiably and unlawfully weights the vote of some voters in Prince George's County, including Plaintiffs, unequally with the weight of other voters in the county.

43.     For the foregoing reasons, Defendants have violated the "one person, one vote" requirements of the Equal Protection Clause, and Plaintiffs are entitled to declaratory, injunctive, and other appropriate relief to secure Defendants' compliance with the United States Constitution and 42 U.S.C. § 1983.

<u>**COUNT II:**</u>
<u>**VIOLATION OF THE POPULATION EQUALITY REQUIREMENTS**</u>
<u>**UNDER THE PRINCE GEORGE'S COUNTY CHARTER**</u>

44.     Plaintiffs reallege and incorporate by reference the allegations

contained in the preceding paragraphs.

45.     Over and above the "one person, one vote" requirements under the

United States Constitution, Section 305 of the Prince George's County Charter

requires that County Council districts be "**equal in population**." *Cf.* Md. Const.

Art. 3 § 4 (requiring state legislative districts to be, *inter alia,* "of *substantially*

*equal* population") (emphasis added). As with congressional districts, and unlike

Maryland's state legislative districts, the County Charter's population equality

standard mandates that County Council districts be drawn "with populations as

close to perfect equality as possible." *Cf. Evenwel v. Abbott*, 578 U.S. 54, 59

(2016) (citing *Kirkpatrick v. Preisler*, 394 U.S. 526, 530-31 (1969)). The County

must make a good-faith effort to achieve "precise mathematical equality" in

council districts and "must justify each variance, no matter how small." *Cf.*

*Karcher v. Daggett*, 462 U.S. 725, 730 (1983).

46.     Because the County Charter operates as Prince George's County's

local constitution, its strict population equality requirement must prevail over other

discretionary or political considerations and judgments, including a desire for

"least change" or to preserve the cores of prior districts. *See In re Legislative Districting of State*, 370 Md. 312, 370 (2002).

47.     As detailed in the preceding paragraphs, the Prince George's County Redistricting Commission did not make an honest and good-faith effort to achieve "precise mathematical equality" across the nine County Council districts. Instead, the Commission set a specific numeric target that allowed for population deviations of up to ±4.5% in each district, and it rejected alternative plans produced by its retained consultant, Dr. Persily, and by the public, that achieved greater population equality and greater compactness.

48.     The Commission's reliance on a specific ±4.5% district deviation target as a "safe harbor," along with other arbitrary, illegitimate, or discriminatory factors, predominated over the local constitutional requirement that districts be "equal in population."

49.     Similarly, the Commission's political and discretionary preference for producing a "least change" plan predominated over the local constitutional requirement that districts be "equal in population."

50.     The Commission's plan unjustifiably and unlawfully weights the vote of some voters in Prince George's County, including Plaintiffs, unequally with the weight of other voters in the county.

51.     For the foregoing reasons, Defendants have violated Section 305 of the Prince George's County Charter, and Plaintiffs are entitled to declaratory, injunctive, and other appropriate relief to secure Defendants' compliance with the said Charter.

### COUNT III:
### VIOLATION OF THE COMPACTNESS REQUIREMENTS UNDER THE PRINCE GEORGE'S COUNTY CHARTER

52.     Plaintiffs reallege and incorporate by reference the allegations contained in the preceding paragraphs.

53.     Section 305 of the Prince George's County requires that County Council districts be "**compact**." Because the County Charter operates as Prince George's County's local constitution, its compactness requirement must prevail over other discretionary or political considerations and judgments, including a desire for "least change" or to preserve the core of prior districts. *See In re Legislative Districting of State*, 370 Md. 312, 370 (2002).

54.     As detailed in the preceding paragraphs, the Prince George's County Redistricting Commission did not make an honest and good-faith effort to ensure that each of the nine County Council districts was as compact as possible, after duly considering a mix of legitimate factors that may make some degree of noncompactness unavoidable, including the paramount requirement for population equality, the concentration or dispersion of people, geographic features of the

County, and other factors that might be conducive to constituent-representative communication, such as convenience of access and communication. Districts 3, 4, and 7 are especially non-compact, including as measured by mathematical compactness scores such as Reock and Polsby-Popper, and these districts form part of a redistricting plan that is non-compact as a whole.

55.    Because of its political and discretionary desire to use a "least change" strategy to preserve the existing districts to the greatest extent possible, the Commission refused to create its own alternative plans and rejected or refused to consider seriously any alternative plans produced by the public, that achieved greater compactness and greater population equality and were more conducive to constituent-representative communication.

56.    For the foregoing reasons, Defendants have violated Section 305 of the Prince George's County Charter, and Plaintiffs are entitled to declaratory, injunctive, and other appropriate relief to secure Defendants' compliance with the said Charter.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiffs demand a judgment in their favor against Defendants, and request the following relief:

a.    A declaration that the 2021 Prince George's County Council legislative districting plan is malapportioned and in violation of the "one person,

one vote" requirements of the United States Constitution and the population

equality requirements of the Prince George's County Charter;

       b.    A declaration that the Prince George's County Council's

legislative districting plan is non-compact in violation of the requirements of the

Prince George's County Charter;

       c.    An order permanently enjoining Defendants from conducting

any further elections for Prince George's County Council positions under the

current redistricting plan;

       d.    An order allowing Prince George's County to submit proposed

remedial plans to present to the Court for approval or modification after notice and

an opportunity for hearing;

       e.    An order awarding Plaintiffs their costs, expenses, and

reasonable attorneys' fees; and

       f.    Grant such other and further relief as Plaintiffs may require or

the Court may deem appropriate and in the interests of justice.

This 10th day of October, 2025.

*/s/ Nicholas Taichi Steiner*

Bradley E. Heard
(D. Md. Bar No. 31835)
Nicholas Taichi Steiner
(D. Md. Bar No. 19670)
Jack M. Genberg*
Carlos M. Andino**

SOUTHERN POVERTY LAW
    CENTER
1107 17th Street NW, Suite 550
Washington, DC 20036
(301) 233-5747 (Direct)
nick.steiner@splcenter.org

*Attorneys for Plaintiffs*

\* Pro Hac Vice Application Forthcoming
\*\*D.Md. Admission Forthcoming