UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

REVEREND DWIGHT COKELY,
MICHAEL ANDREW CARLISLE,
ERICA McKINNEY,
IAN ROWE,
MARK SHRODER and
LEONARD GORE, JR.,

      Plaintiffs,

v.

WENDY HONESTY-BEY,
*in her official capacity as Administrator of the*
*Prince George's County Board of Elections,*
PRINCE GEORGE'S COUNTY,
MARYLAND,

      Defendants.

Civil Action No. 25-3363-TDC

**MEMORANDUM OPINION**

Plaintiffs Reverend Dwight Cokely, Michael Andrew Carlisle, Erica McKinney, Ian Rowe, Mark Shroder, and Leonard Gore, Jr. have brought this civil action against Defendants Prince George's County, Maryland ("the County") and the Administrator of the Prince George's County Board of Elections in which they challenge the 2021 legislative redistricting plan for the Prince George's County Council ("the 2021 Plan").

Specifically, Plaintiffs allege that, pursuant to 42 U.S.C. § 1983, the 2021 Plan violates the "one person, one vote" principle of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, § 1, and a provision of the Prince George's County Charter requiring that a plan presented by a Redistricting Commission to the Prince George's County Council propose legislative districts that are "equal in population" and

"compact." Prince George's Cnty. Charter ("PGC Charter"), art. III, § 305. By agreement of the parties, on January 14, 2026, the Court held a trial on the merits. Pursuant to Federal Rule of Civil Procedure 52(a), the Court now provides its findings of fact and conclusions of law. For the reasons set forth below, the Court finds in favor of Defendants and will enter judgment for Defendants on all counts.

## INTRODUCTION

On October 10, 2025, Plaintiffs filed the Complaint in this case in which they seek a declaratory judgment finding that the 2021 Plan violates the Equal Protection Clause and the Prince George's County Charter ("the Charter"); a permanent injunction barring Defendants from conducting any further elections for members of the Prince George's County Council ("the County Council" or "the Council") under the 2021 Plan and allowing Defendants to submit a proposed remedial plan for Court approval; and attorney's fees and costs. On October 31, 2025, Plaintiffs filed a Motion for a Preliminary Injunction in which they also requested that the Court consolidate the preliminary injunction hearing with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). On November 25, 2025, the County Council filed a Motion to Intervene, which the Court granted. On December 12, 2025, Defendants filed a memorandum in opposition to Plaintiffs' Motion for a Preliminary Injunction, as well as a Motion to Dismiss, or in the Alternative, for Summary Judgment. After the Motions were fully briefed, the parties agreed to consolidation of the preliminary injunction hearing with a trial on the merits to be held on January 14, 2026. Although the parties were given the opportunity to present witnesses and evidence at the trial, they declined to do so and agreed to proceed on the Joint Record submitted with the Motions. After the trial on the merits, the parties agreed to supplement the record with certain records relating to the adoption and amendment of the Charter ("the Charter Records").

2

## FINDINGS OF FACT

The record in this case consists of the Joint Statement of Undisputed Facts, the Joint Record, and the Charter Records. The Joint Record includes, among other exhibits, the County's 2021 Redistricting Commission Plan and Report; transcripts of the meetings of the County's Redistricting Commission on March 23, 2021 and May 3, 2021; a declaration and accompanying exhibits submitted by William S. Cooper, a demographic and redistricting expert and an expert witness for Plaintiffs; and an expert report submitted by Dr. Jeffery Jenkins, a Professor of Public Policy, Political Science, and Law at the University of Southern California and an expert witness for Defendants. It also includes transcripts of the deposition testimony of Cooper, Jenkins, and Reverend James J. Robinson, the Senior Pastor of the Tree of Life Christian Ministries in Clinton, Maryland and the Chair of the 2021 Redistricting Commission. Based on this evidence, the Court finds the following facts.

## I.     Prince George's County Charter

The Prince George's County Charter, first adopted in 1970, currently provides for a County Council comprised of eleven members, including two members elected at-large and nine members elected from nine single-member districts ("Council districts"). Specifically, in Article III of the Charter, which addresses the Legislative Branch, the Charter provides that:

### Section 304.  Council Districts.

(a) Prince George's County is hereby divided into nine Council districts.

(b) The boundaries of the Council districts shall be established pursuant to the provisions of Section 305 of this Charter prior to the filing dates for the 1982 General Election to become effective on noon of the first Monday in December, 1982.

PGC Charter, art. III, § 304.

3

Article III, Section 305 establishes redistricting procedures for redrawing the boundaries

of these Council districts after every decennial United States census. As of the time of the relevant

events in 2021, Section 305 stated:

**Section 305.  Redistricting Procedure.**

The boundaries of Council districts shall be reestablished in 1982 and every tenth
year thereafter.  Whenever district boundaries are to be reestablished the Council
shall appoint, not later than February 1 of the year prior to the year in which
redistricting is to be effective, a commission on redistricting . . . . No person shall
be eligible for appointment to the Commission if he holds any elected office.  By
September 1 of the year prior to the year in which redistricting is to be effective,
the Commission shall prepare, publish, and make available a plan of Council
districts and shall present that plan, together with a report explaining it, to the
Council.  *The plan shall provide for Council districts that are compact, contiguous,
and equal in population.*  No less than fifteen calendar days and no more than thirty
calendar days after receiving the plan of the Commission, the Council shall hold a
public hearing on the plan.  If the Council passes no other law changing the
proposal, then the plan, as submitted, shall become law, as of the last day of
November, as an act of the Council, subject to Sections 320 and 321 of this Charter.

*Id.* § 305 (emphasis added).  Thus, the Charter provides that, in the year after the decennial census,

a Redistricting Commission is tasked with creating a redistricting plan for the County Council's

nine districts, and that plan must provide for districts that are "compact, contiguous, and equal in

population."  *Id.*  The County Council may pass a law that adopts a different plan, but if it takes

no action, the Redistricting Commission's plan becomes law and is implemented.  *See id.*

**II.    The 2021 Redistricting Plan**

On January 28, 2021, pursuant to Section 305 of the Charter, the County Council appointed

a three-member 2021 Redistricting Commission ("the Commission") consisting of Reverend

Robinson, who was appointed as Chair; Dr. Charlene Mickens Dukes, the interim president of

Montgomery College and the former president of Prince George's Community College; and David

C. Harrington, the president of the Prince George's Chamber of Commerce, a former Maryland

state senator, a former member of the County Council, and a member of the 2011 Redistricting

4

Commission. The Commission retained the same redistricting consultant it had used during the 2011 redistricting cycle, Dr. Nathaniel Persily, a professor at Stanford Law School and a nationally recognized expert on elections and redistricting. On September 1, 2021, the Commission submitted its final proposed 2021 Plan and Report ("the Report") to the County Council.

The Commission had it first public meeting on March 23, 2021, but because of delays caused by the COVID-19 pandemic, the United States Census Bureau had not yet released population data from the 2020 census that would ordinarily be available by that time for use in the redistricting process, and the Census Bureau had announced that the data would not be delivered until September 30, 2021, after the statutory deadline of September 1, 2021 for the Commission's plan to be submitted to the County Council. Accordingly, the Commission initially relied on projected data from a private vendor based on which it was estimated that from 2010 to 2020, the population of Prince George's County had grown by 50,792 to a total population of 914,212. This data resulted in an "ideal population" per district ("the ideal district population") of 101,579, consisting of the population per district if each district had exactly the same population. Joint Record ("J.R.") 8, ECF Nos. 68, 71. The Commission adopted five principles to guide its preparation of a new map of Council districts: (1) a "least change plan," which would move the fewest number of people as necessary to comply with the "one person, one vote" requirement; (2) contiguous boundaries; (3) avoidance of precinct splits; (4) districts with no greater than a 4.5 percent population deviation from the ideal district population; and (5) "consideration of assets or community interests that connect each district." J.R. 8, 12. In addition, the Commission decided to use the existing districts as a starting point for the 2021 Plan, rather than starting anew.

The Commission identified several reasons for using the existing districts as the starting point, for seeking a least change plan, and for adopting the identified principles. First, as Robinson

stated at the initial Commission meeting on March 23, 2021, because the Commission was not expected to receive the final Census data until September 2021 and thus had to rely on projected data, it would be difficult to "start from scratch," and as Dr. Persily advised, "starting with the current map will . . . minimize the disruptive potential of everything that we're doing over this next . . . six months." J.R. 1078, 1080. Second, the Commission took lessons from the 2011 Redistricting Commission which, as recounted by Dr. Persily at that initial meeting, had proposed a plan that "pretty much worked from scratch" but was ultimately rejected by the County Council, which chose instead "to work off the existing districts" and not "work off the districts as they were presented by the commission." J.R. 1062–63. Third, as stated in its Report, the Commission recognized that the 2011 Plan was never legally challenged, so there were no known problems with using it as a starting point. Dr. Persily also noted that in 2011, the County Council "felt strongly that it was important to keep precincts together." J.R. 1073.

The Commission decided to work within a 4.5 percent population deviation from the ideal district population, meaning that it would ensure that each district would have a population no more than 4.5 percent higher or lower than the ideal district population, based on Dr. Persily's advice that doing so would give the Commission "some cushion so that even once the new census data comes out," the Commission could "be pretty sure that [the] plan, if enacted, would abide by one person, one vote." J.R. 1069.

Although a least change plan is typically "least disruptive to the incumbents, voters, and the electoral system," the Commission stated in its Report that it "did not consider incumbency, partisanship, or political impact" in preparing the 2021 Plan. J.R. 12. In his deposition, Robinson testified that incumbency was "[a]bsolutely not" considered in designing the redistricting maps, and that in carrying out the Commission's mandate, he was "not interested in politics or

6

incumbency." J.R. 1197–99. He also testified that he "didn't particularly care what the [C]ouncil wanted" out of the redistricting process and that he had "zero" communication with the County Council during the Commission's work on the 2021 Plan. J.R. 1149–1150. Although at the initial Commission meeting, Dr. Persily stated that "incumbents probably like" the existing districts, he also informed the Commission that in the 2011 redistricting cycle, it turned out that some incumbents "were not as attached to their districts as we thought." J.R. 1080.

Overall, the Commission held eleven public meetings and two public hearings at which it received both oral and written public views regarding the proposed Council districts. On June 21, 2021, one month prior to the Commission's first public hearing, the Commission unveiled three preliminary plans prepared by Dr. Persily based on population deviations from the ideal district population of 4.5 percent, two percent, and one percent. The Commission received significant negative public feedback about the two-percent plan, which proposed moving 2,250 people from the Collington Station area of the City of Bowie from District 4 to District 6, which would separate that community from the rest of Bowie. This opposition included numerous messages from residents of Collington Station, including emails asserting that their community should remain in District 4 so as to keep together a shared "community of interest" consisting of the entirety of Bowie. J.R. 1292–93.

The Commission also received oral and written input, as well as alternative proposed redistricting plans, from Bradley Heard, a Prince George's County resident who is now counsel for Plaintiffs but submitted these plans in his personal capacity. In a June 6, 2021 letter, Heard criticized the Commission's decision to adopt a "least change" approach and submitted an "illustrative redistricting plan" that did not derive from the existing districts and which he asserted did "a far superior job of meeting the Commission's other articulated redistricting criteria than a

7

'least change' approach" by lowering the population deviation, being more compact and contiguous, not splitting any precincts or incorporated municipalities, and keeping several Metro Line corridors together. J.R. 1244. Heard also submitted letters on June 14, July 18, July 25, and August 16, which continued to criticize the Commission's least change approach, as well as provide updates to his illustrative plan.

Around August 12, 2021, ahead of the earlier announced schedule, the Census Bureau released its official population data relevant to the redistricting. This data showed that the County population was actually 967,201, which changed the ideal population per district to 107,467. On August 30, 2021, after the Commission updated its work based on the final data, the Commission adopted its proposed 2021 Plan, which generally consisted of the plan based on a 4.5 percent population deviation from the ideal district population, which as a result of the updated data actually had no districts with more than a 4.3 percent population deviation. Specifically, District 8 had a population that was 4.3 percent below the ideal district population, while District 1, the district with the highest population, had a population that was 2.6 percent above the ideal district population. Accordingly, the maximum population deviation between any two districts ("maximum population deviation"), referred to in the Report as the "total deviation," was 6.9 percent. J.R. 23, 52.

The 2021 Plan moved a total of five precincts: two precincts in Adelphi from District 1 to District 2, one precinct in Glenn Dale from District 3 to District 4, and two precincts in District Heights from District 6 to District 7. These moves, in addition to addressing the population imbalances present in the 2020 census data, generally resulted in all or most of Adelphi, Glenn Dale, and District Heights being placed in District 2, District 4, and District 7, respectively. The 2021 Plan did not move the Collington Station area, as would have been required by the two-

8

percent population deviation plan. It had a "core retention rate" of 98.6 percent, meaning that under the 2021 Plan, 98.6 percent of the County population remained in the same district as in the 2011 Plan. Joint Statement of Undisputed Facts ("JSUF") ¶ 28, ECF No. 84; J.R. 1382. Ultimately, the Commission did not adopt any of Heard's plans because they "were not aligned with the Commission's guiding principles." J.R. 1242.

After the Commission submitted the 2021 Plan and its Report to the County Council on September 1, 2021, the County Council did not accept the Commission's proposed plan and instead adopted an alternative redistricting plan that differed significantly from the Commission's plan. The County Council's plan was later challenged on procedural grounds because it had been passed as a resolution rather than a bill and was ultimately invalidated by the Supreme Court of Maryland in *Prince George's County v. Thurston*, 278 A.3d 1251 (Md. 2022), which also held that the 2021 Plan was the operative redistricting plan pursuant to Section 305 of the Charter. *Id.* at 1264. As a result, the Commission's proposed plan—the 2021 Plan—took effect on November 30, 2021.

As a result, the districts delineated in the 2021 Plan were used for elections in 2022 and 2024. For the 2026 election, the candidate filing period closes on February 24, 2026, and the primary election is scheduled for June 23, 2026.

## III.   The Illustrative Plan

Plaintiffs have submitted, as a tool to advance their arguments, an alternative redistricting plan ("the Illustrative Plan") prepared by their expert witness, William Cooper. In developing the Illustrative Plan, Cooper applied the following "traditional redistricting principles": having a population deviation for any district of no more than 100 persons from the ideal district population; having contiguous and compact districts, based on several recognized metrics for compactness;

9

maintaining municipalities and other political subdivisions in the same district when practicable; preserving other communities of interest, in particular, "the population within the inner Beltway and along the Metro lines and stations," which Cooper asserted are "distinct communities of interest based on socioeconomic characteristics"; and "[a]void[ing] dilution of minority voting strength." J.R. 58–59. Cooper specifically did not consider "core retention," or maintaining populations in the same districts as in the prior plan, because of his view that it is "not a traditional redistricting principle." J.R. 59. Under the Illustrative Plan, the maximum population deviation between any two districts is 0.13 percent, as compared to the 2021 Plan's 6.86 percent; the districts are more compact according to three compactness metrics; no municipalities are divided across districts, unlike the 2021 Plan which splits six municipalities; and no incumbents are placed in the same district. In addition, the Illustrative Plan places the Blue, Orange, and southern Green Metro line corridors in single Council districts. However, the Illustrative Plan has a core retention rate as compared to the 2011 Plan of 69.71 percent, substantially lower than the 2021 Plan's core retention rate of 98.6 percent.

## CONCLUSIONS OF LAW

Plaintiffs challenge the 2021 Plan on two grounds. First, they argue that the 2021 Plan violates the Equal Protection Clause of the Fourteenth Amendment because it fails to adhere the principle of "one person, one vote." Pls.' Mot. at 1, ECF No. 19-1. Second, they argue that the 2021 Plan violates Section 305 of the Charter, which states that the Commission's redistricting plan "shall provide for Council districts that are compact, contiguous, and equal in population." PGC Charter, art. III, § 305.

10

## I.    Equal Protection Clause

As to their equal protection argument, Plaintiffs assert that the 2021 Plan, which had a 6.86 percent maximum population deviation, violates the principle of "one person, one vote" because it relied primarily on the principle of "least change" at the expense of prioritizing population equality and other legitimate factors. Pls.' Mot. at 16.  They also argue that the prioritization of "least change" was impermissible, in part because it was a pretext for applying the illegitimate factor of favoring districts that promote the protection of incumbents.

### A.    Legal Standards

In *Baker v. Carr*, 369 U.S. 186 (1962), the United States Supreme Court held that a constitutional challenge to a State's apportionment of seats in a state legislature based on the alleged impairment and dilution of certain citizens' right to vote was a justiciable controversy under the Equal Protection Clause.  *Id.* at 187–88, 198–99.  However, the Court offered no view as to the proper constitutional standard to apply to this issue and instead left it to lower courts to develop such standards.  *Id.* at 198, 226.

In *Gray v. Sanders*, 372 U.S. 368 (1963), the Supreme Court struck down Georgia's "county unit system" for counting votes in the Democratic primary as unconstitutional under the Equal Protection Clause because it effectively gave more voting power to voters in some counties than voters in other counties.  *Id.* at 370–71, 379.  The Court found that the Equal Protection Clause requires that "all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit" based on "[t]he conception of political equality" of "one person, one vote."  *Id.* at 379, 381.

In *Reynolds v. Sims*, 377 U.S. 533 (1964), the first case defining the Equal Protection Clause's constitutional standards for apportionment of state legislative districts, the Supreme Court

11

held that the Equal Protection Clause "guarantees the opportunity for equal participation by all voters in the election of state legislators," such that seats in state legislatures "must be apportioned on a population basis." *See id.* at 566, 568. Specifically, a State must "make an honest and good faith effort to construct districts . . . as nearly of equal population as is practicable." *Id.* at 577. However, the Court recognized that having precise equality of population in districts "is a practical impossibility" and that "[m]athematical exactness or precision" is an unworkable constitutional requirement, so it permitted "some deviations from the equal-population principle" as long as such deviations are "based on legitimate considerations incident to the effectuation of a rational state policy." *Id.* at 577, 579. The Supreme Court later applied *Reynolds* to county legislative bodies. *See Avery v. Midland Cnty.*, 390 U.S. 474, 476 (1968).

In a subsequent application of *Reynolds*, the Supreme Court held that "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." *Gaffney v. Cummings*, 412 U.S. 735, 737, 741, 745 (1973) (finding that a Connecticut state legislative redistricting plan with a maximum population deviation of 7.83 percent did not on its own establish a *prima facie* case of a violation of the Equal Protection Clause requiring a countervailing justification from the State). In *Gaffney*, the Court reasoned that:

> Fair and effective representation may be destroyed by gross population variations among districts, but it is apparent that such representation does not depend solely on mathematical equality among district populations. There are other relevant factors to be taken into account and other important interests that States may legitimately be mindful of. An unrealistic overemphasis on raw population figures, a mere nose count in the districts, may submerge these other considerations and itself furnish a ready tool for ignoring factors that in day-to-day operation are important to an acceptable representation and apportionment arrangement.

*Id.* at 748–49 (internal citations omitted).

12

The Supreme Court has since defined "minor deviations" as those in "an apportionment plan with a maximum population deviation under 10%," defined as the deviation between the most populous and the least populous district. *Harris v. Arizona Indep. Redistricting Comm'n*, 578 U.S. 253, 255–56, 259 (2016) (quoting *Brown v. Thomson*, 462 U.S. 835, 842 (1983)). Thus, "those attacking a state-approved plan must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations' to which [the Court has] referred in *Reynolds* and later cases." *Harris*, 578 U.S. at 259, 263 (finding that a state legislative district plan that had an 8.8 percent maximum population deviation did not violate the Equal Protection Clause where the variations were based on good-faith efforts to comply with the Voting Rights Act). The Supreme Court recognized that "[g]iven the inherent difficulty of measuring and comparing factors that may legitimately account for small deviations from strict mathematical equality, we believe that attacks on deviations under 10% will succeed only rarely, in unusual cases." *Id.* at 259.

Accordingly, because the 2021 Plan has a maximum population deviation of under 10 percent, Plaintiffs have the burden to show that it is more probable than not that the 6.9 percent maximum population deviation reflects the predominance of illegitimate reapportionment factors. *See id.*

## B.    Least Change

Under these principles, the Court finds that Plaintiffs have not met their burden of demonstrating that the 2021 Plan's 6.9 percent maximum population deviation reflects the predominance of illegitimate reapportionment factors. To begin, although Plaintiffs repeatedly claim that Defendants must "justify" the 2021 Plan's population deviation, Pls.' Mot. at 17–18, 21, under *Harris*, absent a showing by Plaintiffs that illegitimate reapportionment factors

13

predominated, Defendants are not required to justify the 2021 Plan. *See Harris*, 578 at 259; *Raleigh Wake Citizens Ass'n v. Wake Cnty. Bd. of Elections*, 827 F.3d 333, 341 (4th Cir. 2016).

More specifically, Plaintiffs' equal protection claim fails because Plaintiffs have not identified an illegitimate factor considered by the Commission, much less one that predominated. Factors that have previously been found to be illegitimate for purposes of this analysis include race discrimination, *see Bush v. Vera*, 517 U.S. 952, 958 (1996), creating significant partisan advantage, and regional favoritism, *see Raleigh Wake Citizens Ass'n*, 827 F.3d at 345, 351. Under the post-*Reynolds* case law, legitimate factors can include compactness, contiguity, maintaining the integrity of political subdivisions, competitive balance among political parties, compliance with the Voting Rights Act, and preserving the cores of prior districts. *See Harris*, 578 U.S. at 258, 264. In the analogous context of congressional redistricting, the Supreme Court has found that "legitimate" factors that could justify population deviations include not only "making districts compact, respecting municipal boundaries," and "avoiding contests between incumbent[s]," but also "preserving the cores of prior districts." *Karcher v. Daggett*, 462 U.S. 725, 740 (1983). Notably, the Supreme Court has since clarified that limiting population shifts between old and new districts is a form of "preserving the cores of prior districts." *See Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758, 764 (2012). In *Tennant*, the Supreme Court, in rejecting a "one person, one vote" challenge to West Virginia's redistricting plan for congressional districts, held that a plan whose "chief selling point was that it required very little change to the existing districts"— effectively, a least change plan—was permissible even though it resulted in a higher population variance than other plans, because "[t]he desire to minimize population shifts between districts is clearly a valid, neutral state policy." *Id.* at 759, 761, 764. More recently, the Supreme Court rejected a race-based challenge to a congressional redistricting plan in part because one of the

14

plaintiff's experts had "failed to consider 'core district retention'" as a "plausible explanation" for population differences. *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1245 (2024). In so ruling, the Court noted that the legitimate interest in core retention "recognizes [the] reality" that "[l]awmakers do not typically start with a blank slate; rather, they usually begin with the existing map and make alterations to fit various districting goals." *Id.*

This precedent firmly establishes that whether labeled as "least change" or "core retention," seeking to minimize population shifts between districts is a legitimate redistricting factor, and that absent legal flaws with the existing map, there is nothing improper about starting the redistricting process from that map. Indeed, despite claiming that least change was the "single illegitimate factor" that rendered the 2021 Plan unconstitutional, Pls.' Mot. at 16, Plaintiffs conceded elsewhere in their brief that "preserving the cores of the prior districts may be a legitimate reason to justify some deviation from perfect population equality among districts," *id*. at 17–18 (citation omitted), and at trial they clarified that they were "not arguing . . . that it's illegitimate to consider core retention in the general sense" and acknowledged that core retention is considered a "traditional redistricting consideration" in the case law. Trial Tr. at 10, ECF No. 90.

In the face of this reality, Plaintiffs suggest in their brief, and more clearly emphasized at trial, that even if least change is a legitimate redistricting factor, the constitutional violation arises from the Commission's use of least change as "the primary motivator" in the redistricting process, ahead of population equality, factors set forth in the Charter such as compactness, and other legitimate factors such as "preserving communities of interest and avoiding municipal splits." Pls.' Mot. at 17–18. This argument fails because it cannot be squared with *Tennant*, in which the Supreme Court upheld a plan for which least change was plainly the primary factor, even under the more stringent test for congressional redistricting which requires justification for any

15

deviations from equal population. *See Tennant*, 567 U.S. at 761, 763–64. More broadly, Plaintiffs have identified no authority for the proposition that, in a challenge to a state or county redistricting plan with less than a 10 percent maximum population deviation, the prioritization of one legitimate redistricting factor over others renders it an illegitimate redistricting factor. Plaintiffs related argument that it is illegitimate for a factor such as least change to predominate over population equality is inherently flawed because, under that theory, no population deviations could ever be justified. Such a theory runs directly afoul of *Harris*, which specifically provides that maximum population deviations under 10 percent require plaintiffs to show that an illegitimate factor, not a legitimate one, predominated. *See Harris*, 578 U.S. at 259.

Plaintiffs' citation to *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), *aff'd mem.*, 542 U.S. 947 (2004), in which a district court struck down a Georgia state legislative plan with a 9.98 percent maximum population deviation, does not alter this conclusion. *Id.* at 1341–42. Although Plaintiffs point to language in *Larios* in which the court criticized the State's apparent efforts to keep the maximum population deviation to no more than 10 percent and apparent ceasing of efforts to reduce such deviations even further once that 10 percent threshold had been achieved, the court specifically declined to decide whether this apparent use of a 10 percent safe harbor without any efforts to achieve greater population equality violated the Equal Protection Clause. *Id.* at 1341. Rather, it invalidated the plan because it found, after extensive factual analysis, that the deviation was based on the illegitimate factors of allowing urban and rural regions to maintain "their legislative influence" at the expense of suburban regions, and of protecting incumbents in a "wholly inconsistent and discriminatory way," specifically, by protecting only Democratic incumbents and arranging for Republican incumbents to have to run against each other. *Id.* at 1341–42, 1347. Notably, in reaching this conclusion, the court considered whether the population

16

deviation could be explained by legitimate factors, including "preserv[ing] the cores of all prior districts," but found that it could not because any core retention was not uniformly applied but instead heavily favored Democratic incumbents while Republican incumbents lost much of the cores of their districts. *Id.* at 1350–51 (emphasis omitted). Here, in contrast, there are no illegitimate factors underlying the population deviations in the 2021 Plan, and the deviations are clearly not based only on the adoption of a particular threshold but instead are based in significant part on an interest in core retention, which is a legitimate factor.

Moreover, the record demonstrates that the Commission did not simply choose a threshold believed to be a safe harbor and make no efforts to achieve greater population equality; rather, the Commission considered but rejected the one- and two-percent plans in part because it received significant public opposition to the two-percent plan from residents of the Collington Station area in Bowie, as it would have separated them from the rest of Bowie. The Commission also considered Heard's alternative plans, which they characterized as "an entirely new plan," but ultimately rejected those alternative plans because they did not align with the Commission's guiding principles, including least change. J.R. 1242. Thus, the record reflects that the Commission considered plans with greater population equality but concluded that they were inadvisable based on legitimate factors, including core retention, maintaining municipalities, and maintaining communities of interest, including in relation to Collington Station. *See Harris*, 578 U.S. at 258, 264; *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 183 (2017) (describing "respect for communities of interest" as a traditional redistricting factor).

Finally, Plaintiffs' reliance on *In re Legislative Districting*, 805 A.2d 292 (Md. 2002), is misplaced. Beyond that fact that Maryland law does not apply to a federal claim under the Equal Protection Clause, that case, rather than barring the prioritization of a legitimate redistricting

factor, merely recognizes the uncontroversial proposition that political or discretionary reasons for redistricting decisions cannot be relied on to such a degree that the plan does not satisfy applicable constitutional requirements. *See id.* at 326. Here, under *Harris*, the federal equal protection requirements are satisfied.

The Court therefore rejects Plaintiffs argument that the Commission's use or prioritization of least change amounted to the predominance of an illegitimate factor such that the 2021 Plan violated the Equal Protection Clause.

## C.    Incumbent Protection

The Court also rejects Plaintiffs' argument that the 2021 Plan violated the Equal Protection Clause because the Commission's focus on least change was a pretext for a "deliberate effort to appease the County Councilmembers by preserving the political status quo," such that the 2021 Plan resulted in an "impermissible incumbent-protection-driven deviation." Pls.' Mot. at 21. This argument fails for multiple reasons. First, upon review of the record, the Court finds that, as a factual matter, the focus on least change was not a pretext for incumbent protection. The Commission explicitly stated in its Report, before any legal challenges were filed, that it "did not consider incumbency, partisanship, or political impact" in preparing the 2021 Plan. J.R. 12. The record of the Commission's meetings does not reveal any focus on protecting incumbents; rather, the transcript of the May 3, 2021 Commission meeting shows that the members were primarily focused on ensuring that specific municipalities or neighborhoods, including University Park and District Heights, were not divided from their traditional communities or were not unnecessarily disrupted by a move to new district. Significantly, Robinson, the Chair of the Commission, when asked whether by focusing on a least change plan the Commission was "considering incumbents to a degree," provided uncontradicted testimony that "[t]here was no way that we were considering

18

incumbency of any type," "I'm not interested in politics or incumbency," and "that was not my mindset." J.R. 1198–99. He also testified that during the time period of the Commission's work, he had no discussions of any kind with any County Council members about the redistricting plan. Plaintiffs have provided no meaningful evidence to the contrary and in fact, at trial, stated that they "take Pastor Robinson at his word that incumbent protection was not the goal" of the Commission. Trial Tr. at 17.

Although Plaintiffs argue that the focus on a least change plan indirectly advanced incumbent protection because the 2011 Plan was unilaterally imposed by the County Council after it rejected the Commission's proposed plan, in fact, only one of the Council members who voted on that 2011 Plan was still on the Council in 2021, and he held an at-large seat unaffected by district lines, so using the 2011 Plan as the starting point for the 2021 Plan was not intended to, and did not actually, advance incumbent protection in any material way.

Most significantly, the claim that the 2021 Plan was designed to advance incumbent protection is wholly undermined by the fact that it was squarely rejected by the County Council, which attempted to replace it with a different plan which, as reported in the media, was heavily criticized by members of the public as designed to move potential candidates into new districts. Had the 2021 Plan actually served to advance incumbent protection, it stands to reason that the County Council would have embraced it rather than fought it all the way to the Maryland Supreme Court.

The Court instead finds that the Commission's focus on using a least change plan was based primarily on the view, as advised by Dr. Persily, that where the release of the official census data was delayed by the COVID-19 pandemic such that the Commission initially had to rely on projected data, a least change plan would "minimize the disruptive potential" of the delayed data.

19

J.R. 1080. It was also informed by the lesson drawn from the 2011 redistricting cycle when the County Council rejected a plan that started from scratch and preferred to work from the existing districts.

More broadly, the record reflects that adoption of a least change plan is not the same as seeking to protect incumbents. Although Dr. Persily stated at the Commission meeting that incumbents probably like their districts, he also stated that in 2011, "some of them were not as attached to their districts as we thought," and that sometimes incumbents "would be happy to change" them. J.R. 1080. Further, as explained by Dr. Jenkins, Defendants' expert witness, a least change plan provides substantial benefits unrelated to protecting incumbents. Specifically, it provides "stability" and "continuity of representation," which can be important because changes in district boundaries raise "the costs of voting by raising the costs of becoming informed," as citizens must invest more time and energy in learning about their new representative and candidates and in finding trusted sources of information about the available choices in their new district. J.R. 1379–81. The Court therefore finds that the Commission, by focusing on a least change plan, was not seeking to advance incumbent protection in the 2021 Plan.

Second, even if the Commission had considered general incumbent protection as a factor, Plaintiffs have identified no authority establishing that such protection is an illegitimate redistricting factor. Rather, the Supreme Court has suggested in other equal protection cases that incumbent protection can be a legitimate factor. *See Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 258–59 (2015) (in assessing whether Alabama's state legislative redistricting plan was based on unconstitutional racial gerrymandering in violation of the Equal Protection Clause, listing "protecting incumbents" among "traditional districting objectives"). Although Plaintiffs rely on *Larios*, in that case the court found only that incumbent protection applied in a "blatantly partisan

20

and discriminatory manner," pursuant to which a redistricting plan was designed to protect incumbents of one political party while undermining incumbents of the other political party by placing them in the same district, was an illegitimate factor. *See Larios*, 300 F. Supp. 2d at 1341– 42, 1347–49 (noting that at the time of that case, the Supreme Court and lower courts had identified only the specific issue of "avoiding contests between incumbents," rather than "general protection of incumbents" as a "legitimate state goal supporting population deviations"). There is no claim that any such partisan, discriminatory incumbent protection was at issue here.

Thus, the Court rejects the argument that the 2021 Plan is unconstitutional based on any allegedly impermissible consideration of incumbent protection.

### D.   Conclusion

In the end, Plaintiffs' equal protection claim fails because, under *Harris*, where the 2021 Plan has only a 6.9 percent maximum population deviation, it is presumptively constitutional, and Plaintiffs have failed to show that the deviation reflects the predominance of an illegitimate redistricting factor, because "least change," a form of "core retention," is a legitimate redistricting factor, and there was nothing illegitimate or improper about prioritizing it. Although Plaintiffs' repeatedly claim, citing *Reynolds*, that Defendants did not "make an honest and good faith effort" to establish districts "as nearly of equal population as is practicable," *Reynolds*, 533 U.S. at 577, the test established in *Harris* is the present refinement of the broad requirement articulated in *Reynolds*, such that Defendants' compliance with *Harris* is sufficient to establish the constitutionality of the 2021 Plan.

In any event, the record reflects that Defendants, in fact, made "an honest and good faith effort" in that the Commission chose the legally permissible approach of starting from the original districts and applying several legitimate factors, including and most prominently least change,

21

which made sense in light of the lack of final data at the outset of the redistricting process. The Commission considered at least one plan, the two-percent population deviation plan, that would have provided greater population equality but declined to adopt it in part because the Commission received significant public opposition to moving the Collington Station area to a different Council district, a concern that effectively validated the emphasis on least change and maintaining municipalities in the same district. While Plaintiffs have offered the Illustrative Plan to show that a plan with greater population equality is possible, that plan was explicitly developed without giving any consideration to core retention or least change and thus has a core retention rate of under 70 percent, meaning that under its terms, almost one-third of the County's citizens would be moved to a district different from their 2011 district. There was nothing illegitimate about the Commission choosing to place a greater emphasis on core retention and to decline to accept the disruption and increased information costs to citizens that would likely follow from plans such as the Illustrative Plan. There is also no requirement that the Commission or the County Council agree with Plaintiffs' view that certain specific areas, such as Metro corridors, constitute communities of interest that must be kept together in the same district at the expense of other considerations.

Therefore, under *Harris*, the Commission's choice to prioritize legitimate factors such as core retention and least change, as well as maintenance of municipalities such as Bowie within the same district, over marginally higher population equality or Plaintiffs' subjective view of the most important communities of interest to prioritize, does not represent the predominance of an illegitimate reapportionment factor. *Harris*, 578 U.S. at 259. For all of the foregoing reasons, the Court finds that the 2021 Plan does not violation the Equal Protection Clause and will grant judgment to Defendants on Count 1.

22

## II.    County Charter

Plaintiffs also argue that the 2021 Plan violates the terms of the Charter, specifically, the requirement that the Commission submit a redistricting plan to the County Council that provides for "Council districts that are compact, contiguous, and equal in population." PGC Charter, art. III, § 305. In Count 2, Plaintiffs argue that the 2021 Plan violates the requirement that the proposed districts be "equal in population," and in Count 3, Plaintiffs argue the 2021 Plan violates the requirement that such districts be "compact." *Id.*

### A.    Equal in Population

In Count 2, Plaintiffs argue that the 2021 Plan, with its 6.9 percent maximum population deviation, violates Section 305 of the Charter because the plain language of that provision requires that Council districts have greater population equality than is required under the Equal Protection Clause and in fact requires "near zero" deviation among the district populations. Pls.' Mot. at 12. More specifically, Plaintiffs ask the Court to apply the standard applied to congressional districts which, based on the Supreme Court's interpretation of Article I, Section 2 of the Constitution, requires that a State must "make a good-faith effort to achieve precise mathematical equality" and "justify each variance, no matter how small," and "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Karcher*, 462 U.S. at 730 (quoting *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31 (1969)). In contrast, Defendants argue that the term "equal in population" is properly construed as referring to the standard for equal population among state and county districts required by the Equal Protection Clause, as established in *Reynolds* and its progeny.

The Court is not aware of any case, and the parties have identified none, that interprets the term "equal in population" as set forth in Section 305 of the Charter. PCG Charter, art. III, § 305.

23

Because when hearing state law claims based on supplemental jurisdiction, district courts apply state substantive law, the Court interprets the Charter under Maryland law. *See Mason & Dixon Intermodal, Inc. v. Lapmaster Int'l LLC,* 632 F.3d 1056, 1060 (9th Cir. 2011) ("When a district court sits in diversity, or hears state law claims based on supplemental jurisdiction, the court applies state substantive law to the state law claims"); *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011). The Maryland Supreme Court has held that "[t]he canons of construction used to interpret statutory language apply with equal force to the interpretation of a charter provision." *Thurston*, 278 A.3d at 1258. As such, the "primary objective is to ascertain the purpose and intent of the charter's framers." *Id.* In assessing such intent, courts "principally focus on the plain language of the challenged provision as the 'primary source of legislative intent.'" *Id.* (quoting *O'Connor v. Baltimore Cnty.*, 854 A.2d 1191, 1198 (Md. 2004)). Here, the relevant language of the Charter was drafted by the elected Charter Board of Prince George's County ("the Charter Board"), which convened in 1968 and 1969, and adopted by the voters of Prince George's County in 1970.

Plaintiffs primarily argue that the Court should adopt the ordinary meaning of the word "equal" and point the Court to its dictionary definition, which is "of the same measure, quantity, amount, or number as another" and "identical in mathematical value or logical denotation." Pls.' Mot. at 12 n.10 (quoting, *Equal*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equal, Pls.' Mot. Ex. 16, ECF No. 20-37). Plaintiffs, however, do not argue for precise numerical equality across all districts. Indeed, the Supreme Court has stated that in the context of redistricting, "absolute equality" is a "practical impossibility" and "hardly a workable" requirement. *Gaffney*, 412 U.S. at 743 (internal citations omitted). By arguing that "equal in population" should actually be interpreted as imposing the standard for congressional redistricting which allows for some population deviations if they can be properly justified, *see*

24

*Karcher*, 462 U.S. at 730, Plaintiffs necessarily acknowledge that they do not seek a literal reading of the word "equal," yet they offer no argument that the plain language of the Charter unambiguously establishes that the Charter Board intended to adopt this standard.

The fact that the text of the Charter does not unambiguously establish a requirement that the Council districts either have absolute equality of population or meet the congressional redistricting standard is further illustrated by consideration of the surrounding text in the Charter. *See Davis v. Mich. Dep't of the Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *Lockshin v. Semsker*, 987 A.2d 18, 29 (Md. 2010) (stating that a court does "not read statutory language in a vacuum" or "confine strictly [its] interpretation of a statute's plain language to the isolated section alone," and that "the plain language must be viewed within the context of the statutory scheme to which it belongs"). Although Plaintiffs cite only the sentence within Section 305 stating that "[t]he plan shall provide for Council districts that are compact, contiguous, and equal in population," PGC Charter, art. III, § 305, consideration of the entirety of Section 305 reveals that this language states only that the redistricting plan submitted by the Commission to the County Council must meet this requirement. Significantly, Section 305 also provides that "[i]f the Council passes no other law changing the proposal, then the plan, as submitted, shall become law," which necessarily establishes that the County Council is not required to accept the Commission's plan. *See id.* Indeed, in *Thurston*, the Maryland Supreme Court confirmed that under the Charter, the County Council is not required to adopt the Commission's plan and may instead enact an entirely different plan, so long as it does so through the standard legislative process. *See Thurston*, 278 A.3d at 1260. Notably, neither the plain language of Section 305 nor *Thurston* requires that any alternative plan adopted by the

25

County Council in this manner must comply with the "equal in population" requirement applicable to the Commission's plan.

Although the immediately preceding section in the Charter establishes requirements for the Council districts themselves, it notably does not include an "equal in population" requirement. *See* PGC Charter, art. III, § 304. Where the present language of Section 304, adopted by amendment in 1980, states that "[t]he boundaries of the Council districts shall be established pursuant to the provisions of Section 305 of this Charter prior to the filing dates for the 1982 General Election to become effective on noon of the first Monday in December, 1982," *id.* § 304(b), that provision does not impose the "equal in population" requirement on Council districts because (1) the reference to Section 305 necessarily incorporates the option of the County Council to reject the Commission's plan and adopt its own plan; and (2) by its plain language, it requires adherence to Section 305 only with respect to the redistricting in advance of the 1982 election. *See id.* Notably, the original 1970 version of Section 304 did not even cross reference Section 305 and thus likewise did not generally require that Council districts be "equal in population." *See* PGC Charter, art. III, § 304 (1970), 1973 Md. Laws 3194, 3204–05.

The Court therefore finds that when read alongside the other sections in Article III, the identified language in Section 305 does not unequivocally establish a requirement that the districts ultimately adopted by the County Council must be "equal in population," much less one that requires adherence to the congressional standard. While the requirement that the Commission's submitted plan have districts "equal in population" could have the effect of requiring the final districts to meet this standard in the event that, as here, the Commission's plan ultimately takes effect by operation of law, it does not necessarily follow from the language of the Charter that the Charter Board intended for a nonconforming plan adopted in this manner to be invalidated. Thus,

26

where there is no claim that the term "equal" in Section 305 requires absolute equality, and where the placement of the "equal in population" language in the Charter does not demonstrate a direct prohibition on the adoption of a redistricting plan that does not meet that requirement, the Court finds that, at a minimum, the text is ambiguous as to whether the Charter actually requires that the final Council districts adopted by the Council must have "near zero" population deviation, comply with the congressional redistricting requirement, or both. Pls.' Mot. at 12.

"In situations where the statutory language is ambiguous" courts must look "beyond the statute's plain language in discerning the legislative intent." *Comptroller of the Treasury v. Clyde's of Chevy Chase, Inc.*, 833 A.2d 1014, 1021 (Md. 2003). In doing so, the Court may consider the Charter's "legislative history and other relevant factors that may reveal the intent or general purpose" of Section 305. *Id.* Upon consideration of all relevant factors, the Court concludes that the reference to "equal in population" in Section 305 does not impose a requirement that Council districts have "near zero" population deviation or comply with the standard for equality among congressional districts and instead requires compliance with the standard for equality required for state and county districts under the Equal Protection Clause.

First, the Court considers not just the term "equal in population," but its placement in the Charter. As discussed above, because the requirement was stated not as an absolute requirement for Council districts, but as a requirement for the Commission's plan that may or may not be adopted, it is unlikely that the Charter Board intended by this language to take the momentous step of establishing a more stringent requirement than the federal constitutional standard for state or county legislative districts. It stands to reason that any such stringent requirement would have been clearly stated in Section 304 as a requirement for Council districts, rather than in Section 305 as a requirement for the Commission's plan that may or may not be ultimately adopted. The

27

placement of this language within Section 305 suggests that it was intended to cause the Commission to submit a plan that already complied with the federal constitutional requirements for state or county legislative districts so as to facilitate the adoption of a final plan, whether the Commission's plan or an alternative plan adopted by the Council, that complies with the applicable federal constitutional standard.

Second, the Court considers the historical context and available legislative history of the Charter and Section 305. The language "compact, contiguous, and equal in population" has been in Section 305 since the Charter's inception in 1970. *See* PGC Charter, art. III, § 305 (1970), 1973 Md. Laws 3194, 3206. The adoption of the Charter and the relevant language came only a few years after *Reynolds v. Sims*, 377 U.S. 533 (1964), had established that the Equal Protection Clause imposed an equality requirement on state legislative districts based on the principle of "one person, one vote," *id.* at 558, 568, 577, and *Avery v. Midland County*, 390 U.S. 474 (1968), which extended *Reynolds* to county legislative districts, *id.* at 476. In *Reynolds*, the Supreme Court explicitly rejected the notion that "equal population" required the arranging of legislative districts "so that each one has an identical number of residents, or citizens, or voters," which is a "practical impossibility" and "[un]workable," *Reynolds*, 533 U.S. at 577, and instead accepted some deviations from the "equal-population principle" to the extent that they were based on "legitimate considerations incident to the effectuation of a rational state policy." *Id.* at 579. Significantly, the official minutes of the Charter Board reflect that at its July 21, 1969 meeting, the Board was advised of *Reynolds* during discussions about how to draw Council districts. *See* Charter Bd. Minutes at 65, ECF No. 88-1. At the same time, the minutes from those and other meetings leading up to the adoption of the Charter provide no basis to conclude that the Charter Board had any view that the federal equal protection standard was too permissive of deviations, or that it had any

28

intention of adopting a standard for equal population more stringent that the equal protection standard for state and county legislative districts set forth in *Reynolds*.

The conclusion that "equal in population" is properly viewed as requiring equality within the meaning of the requirements of the Equal Protection Clause is bolstered by the Report and Recommendations of the 1979 Prince George's County Charter Review Commission, which was tasked with "review[ing] the provisions of Section 305 and recommend[ing] any changes in the framework and procedures outlined therein" at the time when Prince George's County was transitioning to having Council members elected only by the citizens of their single-member districts, as reflected in amendments to the Charter in 1980. Prince George's Cnty. Charter Rev. Comm'n Rep. & Recommendations at 13, ECF No. 88-3. The Charter Review Commission "reviewed the requirements of Section 305 concerning the make-up of each district" and concluded that "[t]he current language, when *read together with relevant judicially espoused standards*, does provide an adequate safeguard for the establishment of Councilmanic districts." *Id.* at 14 (emphasis added). The fact that Section 305, which includes the "equal in population" language, was viewed in this manner further illustrates that it is most appropriately read not as a literal requirement of absolute or near zero equality, but as a term that was informed and aligned with the relevant case law providing standards for the adoption of county legislative districts, consisting of *Reynolds* and its progeny.

Finally, the available historical data regarding the application of Section 305, particularly in relation to the time period immediately following the 1980 amendments, further bolsters the Court's conclusion. Generally, "'[l]ong settled and established practice' can carry 'great weight in' resolving constitutional questions." *Moore v. United States*, 144 S. Ct. 1680, 1693 (2024) (quoting *Chiafalo v. Washington*, 140 S. Ct 2316, 2326 (2020)). "'[A] regular course of practice'

29

can 'liquidate [and] settle the meaning of' disputed or indeterminate 'terms [and] phrases.'" *Chiafalo v. Washington*, 140 S. Ct. 2316, 2326 (2020) (quoting Letter to S. Roane (Sept. 2, 1819), in 8 Writings of James Madison 450 (G. Hunt ed. 1908)). Here, the 1981 redistricting plan, the first plan adopted following the amendments to the Charter establishing that Council members would be elected only by the citizens of their districts, had a maximum population deviation of 7.5 percent, and the more recently adopted decennial redistricting plans for which data is available had maximum population deviations of 5.94 percent (2001) and 7.31 percent (2011). Thus, there has been a practice dating back to the time period of the adoption of the relevant Charter provision of approving redistricting plans with maximum population deviations of 5 to 10 percent, which would be permissible under an interpretation of Section 305 that requires compliance with federal equal protection standards but would likely be impermissible under Plaintiffs' interpretation that requires "near zero" population deviation and compliance with the standard for federal congressional districts. The Court finds that this undisputed historical practice further supports the conclusion that the "equal in population" standard in Section 305 does not demand "near zero" population deviations but instead tracks the equal protection requirements as set forth in *Reynolds* and its progeny, which do not require the justification of minor population deviations of under 10 percent maximum population deviation absent the predominance of illegitimate factors. *See Harris*, 578 U.S. at 259.

Thus, the most straightforward interpretation of the Charter Board's intent is that it included the "equal in population" requirement for the Commission's proposed redistricting plan in order to comply with and align with the federal equal protection standard, such that the requirement is most fairly read as requiring the submitted redistricting plan to have districts that comply with that standard as expressed in *Reynolds* and as refined by its progeny, including *Harris*.

30

It does not require a population deviation "as close to zero deviation as possible," Pls.' Mot. at 13, a standard that has never been required under the Equal Protection Clause.

Plaintiffs' arguments to the contrary are unpersuasive. Having rejected the federal equal protection standard while also acknowledging that mathematical equality is not a practical standard, Plaintiffs argue that the Charter's use of the term "equal in population" must refer to the more stringent equal population standard required for congressional districts, under which congressional districts must be equal "as nearly as is practicable," *Wesberry v. Sanders*, 376 U.S. 1, 7–8 (1964), any population deviations that are not "unavoidable despite a good-faith effort to achieve absolute equality" must be justified by the State, "no matter how small," *Kirkpatrick v. Preisler*, 394 U.S. 526, 531 (1969), and any such justifications must be shown "with some specificity" to meet a legitimate objective that required the specific population deviation. *Karcher*, 462 U.S. at 740–41. Plaintiffs, however, identify no principled basis for interpreting the Charter's language in this way. Significantly, the stricter equality requirement for congressional redistricting derives from the Supreme Court's interpretation of Article I, Section 2 of the United States Constitution, which states that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States." U.S. Const. art. I, § 2; *see Wesberry*, 376 U.S. at 7–8. Where the word "equal" does not appear in this constitutional provision, there is no text-based argument for applying the congressional standard to Section 305. Further, where the Supreme Court's interpretation of this provision is based to a significant degree on the specific "historical context" of its adoption by the Constitutional Convention as part of the Great Compromise that established the bicameral Congress, *see Wesberry*, 376 US. at 7–8, 12–14, there is no persuasive reason to conclude that the Charter Board, acting in an entirely different historical context, intended to adopt the same equality standard as those cases. Finally, a review

31

of the minutes of the Charter Board reveals that while they memorialize some discussion of *Reynolds*, they make no mention of *Wesberry*, *Kirkpatrick*, or any other preexisting case defining the equal population requirement for congressional districts, and they in no way reveal any intent on the part of the Charter Board to establish a more stringent equal population standard than the standard applicable to equal protection, much less to adopt the congressional redistricting standard.

Moreover, Plaintiffs' argument that the term "equal in population" must require compliance with the congressional redistricting standard because it was not qualified by the term "substantially" also fails. Plaintiffs assert that because the Charter Board "had the example of the Maryland Constitution" which provides that "[e]ach legislative district shall consist of adjoining territory, be compact in form, and of substantially equal population," Md. Const. art. III, § 4, its omission of the word "substantially" demonstrates that it intended to impose a more stringent equality standard than either the federal or state constitutional requirements for state or county legislative districts. Reply at 9, ECF No. 66. This argument is flawed because although Section 4 of the Maryland Constitution previously had a similar provision, the term "substantially equal population" did not appear in Section 4 until an amendment was adopted in 1972, two years after the adoption of the Charter. *See* 1972 Md. Laws 1214–15.

In the end, where Plaintiffs acknowledge that the term "equal in population" cannot and does not require actual equality of population across Council districts, the Court is required to discern the intent of the Charter Board in adopting that language. There is no evidence to suggest that the Charter Board intended to adopt its own standard separate and apart from any previously articulated standard, and Plaintiffs have not identified or defined any such individualized standard. As discussed above, upon review, the Court finds that the Charter Board intended to track the federal equal protection standard for state and county legislative districts, not the congressional

redistricting standard. Such an interpretation makes logical sense, because it is not at all uncommon for state law provisions, even those with textual differences, to be interpreted as co-extensive with federal law. *See, e.g., Washington v. State*, 287 A.3d 301, 336–337 (Md. 2022) ("[W]e interpret Article 26 [of the Maryland Declaration of Rights] *in pari materia* with the Fourth Amendment, meaning that the protections under Article 26 are coextensive with those under the Fourth Amendment."); *Town of Riverdale Park v. Ashkar*, 255 A.3d 140, 159 (Md. 2021) ("This Court has recognized that Title VII is the federal analog to [the Maryland Fair Employment Practices Act] and has expressly been guided by cases from the United States Supreme Court in resolving discrimination claims arising under Maryland law.").

Indeed, Plaintiffs notably have not identified any county within Maryland, or any local jurisdiction anywhere in the nation, which has adopted and implemented a more stringent standard for equal population across its legislative districts than the applicable equal protection standard under *Reynolds* and its progeny, whether the standard for federal congressional districts or some unique, individualized standard. The Court declines Plaintiffs' invitation to find that merely by using the word "equal" in Section 305, which on its face addresses only the requirements for the type of redistricting plan to be submitted by the Commission to the County Council, the Charter Board intended to take such a remarkable and unprecedented step. Thus, for the reasons stated above, the Court concludes that Section 305 of the Charter does not mandate that the County's Council districts have greater population equality than is required by the federal equal protection standard for state and county legislative districts. Because, as discussed above, the Court has found that the 2021 Plan does not violate the Equal Protection Clause, it finds in turn that the 2021 Plan does not violate the "equal in population" term in the Charter and will grant judgment to Defendants on Count 2. *See supra* part I.

**B.  Compactness**

Plaintiffs also allege that the 2021 Plan violates Section 305 of the Charter because the districts are insufficiently compact. As evidence, Plaintiffs point to their Illustrative Plan, which they assert to be more compact than the 2021 Plan pursuant to various standard metrics for assessing compactness. However, there is nothing in the text of Section 305 that requires that districts proposed in the Commission's redistricting plan must be the most compact districts that can be feasibly drawn. Notably, in the context of interpreting the similar requirement in the Maryland Constitution that state legislative districts "be compact in form," Md. Const. art. III, § 4, the Maryland Supreme Court concluded that "the compactness requirement in state constitutions is intended to prevent political gerrymandering," that "irregularity of shape or size of a district is not a litmus test proving violation of the compactness requirement," and that "an affirmative showing is ordinarily required to demonstrate that such districts were intentionally so drawn to produce an unfair political result." *In re Legislative Districting of the State*, 475 A.2d 428, 443 (Md. 1982). Accordingly, redistricting plans have "a presumption of validity, and it is not the province of the judiciary to strike down a district as being noncompact simply because a more geometrically compact district might have been drawn." *Id.*

Here, Plaintiffs have made no showing that the Charter Board intended that the term "compact" impose a more stringent standard than the Maryland constitutional standard and in fact have not proposed any particular legal standard. Under the Maryland standard, Plaintiffs' claim fails because it relies almost entirely on the proposition that there are redistricting plans such as the Illustrative Plan that could be drawn with more compact districts. *See id.* Significantly, Cooper, Plaintiffs' expert, conceded that although the 2021 Plan is "not as compact as the illustrative plan, . . . based on my experience overall, it's probably okay." J.R. 920. A review of

the map of the 2021 Plan confirms Cooper's conclusion that the districts are sufficiently compact, as none of the nine districts are notably irregular in shape, *see* J.R. 22, and while Plaintiffs' report on the 2021 Plan's compactness scores under various metrics, they cite no authority for the proposition that those scores establish insufficient compactness under any legal standard, federal or state, much less one applicable to the Charter. Indeed, at the hearing, Plaintiffs acknowledged that the 2021 Plan "is not the most non-compact plan in the world" but instead argued only that the record does not contain evidence that the Commission affirmatively made a good faith effort to achieve compactness. Trial Tr. at 49. Plaintiffs, however, have provided no legal authority for the proposition that the Commission was required, under the terms of the Charter, to do more than achieve compactness. Rather, where the 2011 Plan was already sufficiently compact, and the 2021 Plan made only limited adjustments to that plan and resulted in a set of districts that remain compact, there was no specific need affirmatively to focus on that issue.

For these reasons, the Court declines to invalidate the 2021 Plan based on the Commission's alleged failure to propose districts that are sufficiently compact under the Charter and will grant judgment to Defendants on Count 3.

Because the Court finds in favor of Defendants on the merits of all counts, it need not and will not address Defendants' remaining arguments, including their laches argument.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendants on all counts and will enter judgment for Defendants. A separate Order shall issue.

Date: February 6, 2026



THEODORE D. CHUANG
United States District Judge